Filed 6/27/13

# IN THE SUPREME COURT OF CALIFORNIA

KEWHAN ROBEY,                                        )
                                                     )
        Petitioner,                              )
                                                     )        S197735
        v.                                       )
                                                     )        Ct.App. 2/6 B231019
THE SUPERIOR COURT OF SANTA                          )
BARBARA COUNTY,                                      )        Santa Barbara County
                                                     )        Super. Ct. No. 1349412
        Respondent;                              )
                                                     )
THE PEOPLE,                                          )
                                                     )
        Real Party in Interest.                  )
_____)

       Petitioner Kewhan Robey was arrested and charged with possession of marijuana for sale and with the sale or transportation of marijuana after police seized a package from a private shipping company and discovered the drug inside. The superior court denied petitioner's motion to suppress evidence, relying on exigent circumstances and inevitable discovery. The Court of Appeal granted Robey's petition for writ of mandate and ordered the superior court to grant the motion to suppress. The Office of the Santa Barbara County District Attorney, as real party in interest, sought this court's review on two issues: (1) whether a police officer may conduct a warrantless search of a package seized from a common carrier based on the exigent circumstance of the container's mobility, and

1

(2) whether a police officer can conduct a warrantless search based on the "plain smell" of contraband.

On the first issue, we hold that although a container's mobility may constitute exigent circumstances sufficient to justify a warrantless seizure, it cannot alone justify a search of the container once it has been seized. On the second issue, we find that the District Attorney forfeited the plain smell argument by failing to raise it in opposition to petitioner's motion to suppress in the superior court. Because the District Attorney presents no other grounds to justify the search of the container, petitioner's motion to suppress should be granted as to the evidence obtained as a result of the warrantless search.

## I.

On July 23, 2010, FedEx employee Nancy Her contacted the Santa Maria Police Department to report that a package smelling of marijuana had been dropped off for shipment to an Illinois address. Officer Nathan Totorica responded. As he entered the store and walked toward the package, Officer Totorica smelled the odor of marijuana, which got stronger as he approached the package. Nancy Her informed Officer Totorica that FedEx could not deliver the package and asked what she should do with it.

Officer Totorica seized the unopened and sealed box as evidence and took it to the police station. At the station, he contacted his supervisor, Lieutenant Jerel Haley, who also concluded that the box smelled of marijuana. The officers conferred with the narcotics unit and then opened the box. Inside they found 444 grams of marijuana. The officers did not seek a warrant for either the seizure or subsequent search of the container.

Three days later, petitioner Robey arrived at the same FedEx location to inquire about an undelivered package. Her recognized petitioner as the man who had delivered the box seized by the police, and she telephoned Officer Totorica.

2

Officer Totorica returned to the store and arrested petitioner, who was carrying a packing slip for the seized package.

Petitioner was charged with possession of marijuana for sale and with the sale or transportation of marijuana. (Health & Saf. Code, §§ 11359, 11360, subd. (a).) The superior court denied petitioner's motion to suppress evidence, finding that exigent circumstances justified the seizure and that the subsequent search was valid under the inevitable discovery doctrine, presumably because the police had sufficient probable cause to obtain a warrant had one been sought.

Petitioner then sought a writ of mandate in the Court of Appeal, which in turn issued an order to show cause to the superior court. The Court of Appeal, on its own initiative, asked the parties to provide an informal response to several questions, including whether the plain smell of marijuana, by itself, would have allowed the search and seizure of the package without a warrant. After briefing and argument by the parties, the Court of Appeal granted the petition and issued a peremptory writ of mandate directing the trial court to grant petitioner's motion to suppress evidence. Without deciding whether the officer was entitled to seize the package, the Court of Appeal held (1) that exigent circumstances did not justify the subsequent search of the container, (2) that the odor of contraband alone cannot justify a warrantless search, (3) that the inevitable discovery doctrine did not apply to the facts here, and (4) that petitioner had not abandoned the package and therefore had "standing" to seek suppression of the evidence.

The District Attorney sought review in this court on two issues: whether the mobility of the package constituted an exigent circumstance permitting the officers to conduct a warrantless search after the package was already seized, and whether the plain smell of marijuana constitutes an exception to the warrant requirement. We granted review.

3

## II.

"Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1118; see Cal. Const., art. I, § 28, subd. (f)(2).) "In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." (*Lenart*, at p. 1119.)

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " (*California v. Ciraolo* (1986) 476 U.S. 207, 211, quoting *Katz v. United States* (1967) 389 U.S. 347, 360 (conc. opn. by Harlan, J.).) "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citation.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (*Katz*, at pp. 351–352 (maj. opn.).) "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' [(*Katz,* at p. 357).]" (*Mincey v. Arizona* (1978) 437 U.S. 385, 390.) It is well established that the Fourth Amendment's protection extends to letters and other sealed packages in shipment. (See, e.g., *United States v. Jacobsen* (1984) 466 U.S. 109, 114 (*Jacobsen*); *United States v. Van Leeuwen* (1970) 397 U.S. 249, 251–252; *Ex parte Jackson* (1877) 96 U.S. 727, 733.)

As an initial matter, the District Attorney says petitioner abandoned his interest in the package by using a false name and address when he shipped it. But

4

this argument is unavailing because the District Attorney, at the suppression hearing, accepted petitioner's offer of proof to establish a privacy interest in the container, a concession inconsistent with the District Attorney's later claim of abandonment. In addition, the District Attorney did not enter the packing slip into evidence or create any other record of a false name or address to support a claim of abandonment in response to defense counsel's claim that petitioner showed he continued to have an interest in the package by checking on its delivery after leaving it for shipment. (See *People v. Pereira* (2007) 150 Cal.App.4th 1106, 1113–1114 [upholding trial court's finding that defendant did not abandon package despite using false name and return address because other evidence showed defendant " 'really care[d] about it getting delivered' "].)

As to the first issue on which we granted review, the District Attorney contends that petitioner's motion to suppress should be denied because the warrantless seizure and subsequent search of the container in this case were justified by exigent circumstances arising from the container's mobility. Here petitioner contests only the search, not the seizure, of the container. As explained below, we conclude that although the mobility of a package in shipment may constitute an exigent circumstance permitting officers to seize it without a warrant, such mobility cannot alone justify a warrantless search of the package after it has been seized.

**A.**

The District Attorney argues that "[o]nce the package was seized, law enforcement had the right to open the package based on the exigent circumstances that existed at the time of the seizure." For this proposition, the District Attorney relies principally on *People v. McKinnon* (1972) 7 Cal.3d 899 (*McKinnon*). The defendant in *McKinnon* brought five cartons to an airline freight counter for shipment, describing their contents as "personal effects." After the defendant left,

5

an airline employee suspected that the cartons contained contraband and, upon opening one of the cartons, found several brick-shaped packages inside. The employee, believing he had discovered marijuana in one of the packages, telephoned the police. When the officer arrived, the carton remained open, and the officer could see the same brick-shaped packages. The officer "formed the opinion that the substance in the packages was marijuana. He proceeded to open one of the packages, and verified its contents." (*Id.* at p. 903.)

This court, by a four-to-three majority, upheld the warrantless search and, in so doing, overruled a pair of four-to-three decisions issued three years earlier holding that when containers consigned for shipment are safely in the carrier's custody, there is no exigent circumstance justifying a warrantless search. (*McKinnon*, *supra*, 7 Cal.3d at p. 910, overruling *People v. McGrew* (1969) 1 Cal.3d 404 (*McGrew*) and *Abt v. Superior Court* (1969) 1 Cal.3d 418 (*Abt*).) The basis for the overruling, *McKinnon* said, was that the intervening high court decision in *Chambers v. Maroney* (1970) 399 U.S. 42 (*Chambers*) "undermine[d] the foundation of the majority opinions in *McGrew* and *Abt*." (*McKinnon*, at p. 910.)

In *Chambers*, the high court held that where police have probable cause to stop and search a car without a warrant, a subsequent search of the car after it has been driven to a police station is also permissible without a warrant. (*Chambers*, *supra*, 399 U.S. at pp. 51–52.) *Chambers* observed that the high court had long adhered to the rule that a warrantless search of an automobile is permissible so long as the police have probable cause to believe the car contains evidence or contraband. (*Id.* at p. 48, citing *Carroll v. United States* (1925) 267 U.S. 132 (*Carroll*).) This exception to the warrant requirement, *Chambers* said, is justified by the ease with which an automobile might be moved out of the jurisdiction before a warrant can be obtained. (*Chambers*, at pp. 48, 51.) Although *Chambers*

6

recognized that the problem of mobility might be solved by first seizing the car and then seeking a search warrant, the high court declined to adopt such a rule: "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment. [¶] . . . The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." (*Id.* at p. 52.)

The court in *McKinnon* said "the rationale of *Chambers*" is not "limited to searches of automobiles and similar self-propelled 'vehicles' such as trucks, trains, boats, or airplanes." (*McKinnon*, *supra*, 7 Cal.3d at p. 908.) *McKinnon* stated: "[W]henever [a container] is consigned to a common carrier, there can be no doubt that it is intended, in fact, to be moved." (*Id.* at p. 909.) Because "all goods or chattels consigned to a common carrier for shipment" are "no less movable than an automobile," the court said, "the reasons for the rule permitting a warrantless search of a vehicle upon probable cause are equally applicable to the search of such a chattel." (*Ibid.*) The court assigned "no constitutional relevance" to the fact that the cartons were already in the carrier's safe custody: "In *Chambers* the defendants' automobile was seized by police officers and impounded at the police station; if the high court can say, as it does, that under those circumstances 'the mobility of the car' still obtained *at the station house* [citation], a fortiori a chattel such as here involved remains 'mobile' in the constitutional sense despite its limited and voluntary bailment to a common carrier." (*McKinnon*, at p. 910.)

7

*McKinnon* thus held that "when the police have probable cause to believe a chattel consigned to a common carrier contains contraband, they must be entitled either (1) to search it without a warrant or (2) to 'seize' and hold it until they can obtain a warrant; absent these remedies, the chattel will be shipped out of the jurisdiction or claimed by its owner or by the consignee." (*Id.* at p. 909.)

Three justices dissented in an opinion by Justice Peters. While acknowledging that the court was "bound" by *Chambers*, Justice Peters said "*Chambers*, however, does not purport to apply to everything that is not nailed down or affixed to realty. The Supreme Court's opinion is closely tied to a long series of cases involving one and only one form of movable object — that which is used as a vehicle to transport goods from one place to another." (*McKinnon*, *supra*, 7 Cal.3d at p. 920 (dis. opn. by Peters, J.).) Responding to the court's assertion that a container consigned for shipment "remains 'mobile' in the constitutional sense despite its limited and voluntary bailment to a common carrier" (*id.* at p. 910), Justice Peters said: "Indeed, chattels will retain their movable character anywhere, whether within a depot, dwelling house, or concrete vault as well as an airport, unless they are affixed to realty or otherwise rendered nonmovable. The point is not that the chattels here involved were within the custody of the airlines, but that they were *not* in a vehicle capable of moving them beyond the jurisdiction on its own power; i.e., they had not entered the course of transportation. Drawing a line at goods physically aboard a carrier at least has the virtue of certainty. This is the line drawn by the United States Supreme Court in case after case. If *all* things movable could be searched without a warrant if there were probable cause to believe they contained evidence or contraband, the Fourth Amendment would be rendered nugatory, and in effect the search without a warrant would become the rule rather than the exception." (*Id.* at p. 923 (dis. opn. by Peters, J.).)

8

The central premise of *McKinnon* — the reason it gave for overruling *McGrew* and *Abt* — is that the high court's decision in *Chambers*, though involving an automobile search, stands for the broader principle that not only cars but also " 'other things readily moved' " are subject to warrantless search upon probable cause. (*McKinnon*, *supra*, 7 Cal.3d at p. 909, italics omitted.) Indeed, the *McKinnon* court appeared to treat automobiles as simply one kind of movable container: "To be sure, [a box consigned for shipment] has neither wheels nor motive power; but these features of an automobile are legally relevant only insofar as they make it movable despite its dimensions. A box, which is a fraction of the size and weight of an automobile, is movable without such appurtenances." (*Id.* at p. 909.) According to *McKinnon*, a package consigned for shipment falls under the same rule as an automobile: its mobility renders it subject to a warrantless search either on the spot or at the station house.

However, during the more than four decades since *Chambers* was decided, the high court has never extended the rationale of that decision in the manner that *McKinnon* did. To the contrary, as we explain below, subsequent cases treat *Chambers* as part of line of authority specifically addressing automobile searches, and the high court has repeatedly held that a movable container suspected to hold evidence or contraband is subject to a warrantless search *if the container is located inside an automobile*. Outside the context of an automobile search, the high court has not applied the rationale of *Chambers*, *Carroll*, or any other authority to hold that the mobility of a container by itself constitutes an exigent circumstance justifying a warrantless search. Instead, the settled rule is that "[e]ven when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." (*Jacobsen*, *supra*, 466 U.S. at p. 114.) The development of the law since *McKinnon*

9

undermines its reliance on *Chambers* as a basis for extending the well-delineated automobile exception to "all goods or chattels consigned to a common carrier for shipment." (*McKinnon*, at p. 909.)

**B.**

Seven years after *Chambers*, the high court decided *United States v. Chadwick* (1977) 433 U.S. 1 (*Chadwick*), which considered the warrantless search of a container seized from an automobile. In *Chadwick*, federal agents learned of two passengers transporting a suspicious footlocker by rail and met the train at its destination along with a police dog trained to detect marijuana. Without alerting the suspects, the dog signaled the presence of drugs in the footlocker. The officers continued to observe the suspects as they loaded the footlocker into the trunk of a waiting automobile. At that point, before the car engine was started, the officers arrested the men and seized the footlocker, transporting it to the station house. There the officers opened the locked footlocker without a warrant and discovered marijuana inside. (See *id.* at pp. 3–5.)

Although the footlocker was seized from an automobile, the high court held that the automobile exception did not apply. (*Chadwick*, *supra*, 433 U.S. at pp. 11–13.) The court explained that the "footlocker's mobility [does not] justify dispensing with the added protections of the Warrant Clause. Once the federal agents had seized it at the railroad station and had safely transferred it to the Boston Federal Building under their exclusive control, there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained. The initial seizure and detention of the footlocker, the validity of which respondents do not contest, were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant." (*Id.* at p. 13, fn. omitted.)

10

Relying on "the rationale of [the high court's] automobile search cases," the government argued that "luggage [is] analogous to motor vehicles for Fourth Amendment purposes." (*Chadwick*, *supra*, 433 U.S. at pp. 11–12.) The high court acknowledged the automobile search cases, including *Chambers*, but then rejected the analogy on several grounds. Whereas a footlocker may be "safely immobilized" upon seizure, "[t]his may often not be the case when automobiles are seized. Absolutely secure storage facilities may not be available, [citation], and the size and inherent mobility of a vehicle make it susceptible to theft or intrusion by vandals." (*Id.* at p. 13 & fn. 7.) Moreover, even where " 'the possibilities of the vehicle's being removed or evidence in it destroyed [are] remote, if not nonexistent,' " a warrantless search is justified by "the diminished expectation of privacy which surrounds the automobile." (*Id.* at p. 12.) A person has a diminished expectation of privacy in an automobile because " 'its function is transportation[,] . . . it seldom serves as one's residence or as the repository of personal effects[,] [i]t travels public thoroughfares where both its occupants and its contents are in plain view' " (*id.* at p. 12), and both vehicles and drivers are subject to extensive regulation by states and localities (*id.* at p. 13). By contrast, "a person's expectations of privacy in personal luggage are substantially greater than in an automobile." (*Id.* at p. 13.) Finally, "[i]t was the greatly reduced expectation of privacy in the automobile, coupled with the transportation function of the vehicle, which made the Court in *Chambers* unwilling to decide whether an immediate search of an automobile, or its seizure and indefinite immobilization, constituted a greater interference with the rights of the owner. This is clearly not the case with locked luggage." (*Id.* at pp. 13–14, fn. 8; see *ibid.* ["[a] search of the interior was . . . a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker" even though the impoundment infringed on the owners' use and possession].)

Two years later, the high court in *Arkansas v. Sanders* (1979) 442 U.S. 753 (*Sanders*) applied the rule in *Chadwick* to a suitcase found in "an automobile lawfully stopped and searched on the street." (*Sanders*, at p. 762.) As in *Chadwick*, the police in *Sanders* had information that the respondent was carrying drugs in his luggage. The police met him at the airport and observed as he placed his luggage in the trunk of a taxi and departed the airport. The police followed, stopping the taxi several blocks later. An officer opened the trunk and unlocked the suitcase without a warrant to discover marijuana inside. (See *id.* at p. 755.)

After citing its automobile search cases, including *Chambers*, and affirming the distinctions drawn in *Chadwick* between luggage and automobiles, the high court in *Sanders* said: "A closed suitcase in the trunk of an automobile may be as mobile as the vehicle in which it rides. But as we noted in *Chadwick*, the exigency of mobility must be assessed at the point immediately before the search — after the police have seized the object to be searched and have it securely within their control. [Citation.] Once police have seized a suitcase, as they did here, the extent of its mobility is in no way affected by the place from which it was taken. Accordingly, as a general rule there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places." (*Sanders*, *supra*, 442 U.S. at pp. 763–764, fns. omitted.) Thus *Sanders*, like *Chadwick*, recognized a general rule that movable containers, once lawfully seized, may not be searched without a warrant and declined to carve out an exception for luggage seized from an automobile. (See *Sanders*, at p. 766 ["In sum, we hold that the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to such luggage in other locations. Thus, insofar as the police are entitled to search such luggage without a warrant, their actions must be justified under some exception to

the warrant requirement other than that applicable to automobiles stopped on the highway."].)

The high court in *Sanders* rejected the state's argument that under *Chambers*, "if the police were entitled to seize the suitcase, then they were entitled to search it." (*Sanders*, *supra*, 442 U.S. at p. 765, fn. 14.) The court saw "the seizure of a suitcase as quite different from the seizure of an automobile. In *Chambers*, if the Court had required seizure and holding of the vehicle, it would have imposed a constitutional requirement upon police departments of all sizes around the country to have available the people and equipment necessary to transport impounded automobiles to some central location until warrants could be secured. Moreover, once seized automobiles were taken from the highway the police would be responsible for providing some appropriate location where they could be kept, with due regard to the safety of the vehicles and their contents, until a magistrate ruled on the application for a warrant. Such a constitutional requirement therefore would have imposed severe, even impossible, burdens on many police departments. [Citation.] No comparable burdens are likely to exist with respect to the seizure of personal luggage." (*Ibid.*)

Three years after *Sanders*, the high court in *United States v. Ross* (1982) 456 U.S. 798 (*Ross*) held that where police have probable cause to search an automobile without a warrant, the search may encompass not only a closed compartment such as a glove box, but also any containers or packages found inside the vehicle. Applying the principle that "[t]he scope of a warrantless search based on probable cause is no narrower — and no broader — than the scope of a search authorized by a warrant supported by probable cause," *Ross* explained that "[t]he scope of a warrantless search of an automobile is . . . not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to

believe that it may be found." (*Id.* at pp. 823–824.) "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*Id.* at p. 825.)

The high court in *Ross* had occasion to review its automobile search cases, and it clarified that the justification for searching an automobile without a warrant is not strictly based on exigency: "although a failure to *seize* a moving automobile believed to contain contraband might deprive officers of the illicit goods, once a vehicle itself has been stopped the exigency does not necessarily justify a warrantless *search*." (*Ross*, *supra*, 456 U.S. at p. 807, fn. 9, citing *Chambers*, *supra*, 399 U.S. at pp. 62–64 (conc. & dis. opn. by Harlan, J.).) With regard to *Chambers*'s holding that a vehicle may be searched without a warrant after it has been impounded if it could have been searched on the spot, *Ross* explained that the rule is "based on the practicalities of the situations presented and a realistic appraisal of the relatively minor protection that a contrary rule would provide for privacy interests. Given the scope of the initial intrusion caused by a seizure of an automobile — which often could leave the occupants stranded on the highway — the Court [in *Chambers*] rejected an inflexible rule that would force police officers in every case either to post guard at the vehicle while a warrant is obtained or to tow the vehicle itself to the station. Similarly, if an immediate search on the scene could be conducted, but not one at the station if the vehicle is impounded, police often simply would search the vehicle on the street — at no advantage to the occupants, yet possibly at certain cost to the police." (*Ross*, at p. 807, fn. 9.)

Further, the high court in *Ross* distinguished *Chadwick* and *Sanders*. Whereas *Ross* involved the search of a container found inside a car where "police officers had probable cause to search respondent's entire vehicle" (*Ross*, *supra*, 456 U.S. at p. 817), *Chadwick* and *Sanders* were cases where police had probable cause to believe only that the luggage — and not "the vehicle or anything [else]

14

within it" — contained contraband. (*Ross*, at p. 814; see *id.* at p. 824 ["Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab."].) In concluding that "an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that *the vehicle* is transporting contraband" (*id.* at p. 823, italics added), *Ross* "reject[ed] some of the reasoning in *Sanders*" broadly suggesting that "a warrantless search of a container found in an automobile could never be sustained as part of a warrantless search of the automobile itself" (*Ross*, at pp. 814, 824). *Ross* also said, in tension with *Chadwick*'s statement concerning diminished privacy expectations in cars, that "[c]ertainly the privacy interests in a car's trunk or glove compartment may be no less than those in a movable container" yet "[t]hese interests must yield to the authority of a search . . . ." (*Ross*, at p. 823.) But the high court continued to adhere to the holdings in *Sanders* and *Chadwick* because those cases, unlike *Ross*, involved probable cause to search only a container and not the car where the container was found. (*Ross*, at pp. 809–814, 824.)

Finally, *California v. Acevedo* (1991) 500 U.S. 565 (*Acevedo*) dispensed with the "dichotomy between the rule in *Chadwick* and the rule in *Ross*," which "dictate[d] that if there is probable cause to search a car, then the entire car — including any closed container found therein — may be searched without a warrant, but if there is probable cause only as to a container in the car, the container may be held but not searched until a warrant is obtained." (*Acevedo*, at p. 568.) Explaining that "*Sanders* was explicitly undermined in *Ross*" and that "the dual regimes for automobile searches that uncover containers has proved . . . confusing" for courts and police officers, the high court concluded that "it is better to adopt one clear-cut rule to govern automobile searches and eliminate the warrant requirement for closed containers set forth in *Sanders*." (*Id.* at p. 579.)

15

*Acevedo* held: "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." (*Id.* at p. 580.) The high court thus extended the rule in *Ross* for searching a container found in the course of a lawful automobile search "to all searches of containers found in an automobile," including a search supported only by probable cause that the container, and not the car, holds evidence or contraband. (*Id.* at p. 579.) In so holding, *Acevedo* overruled *Chadwick* and *Sanders* on that point. (*Id.* at pp. 576–579.)

## C.

The case law on automobile searches, from *Carroll* to *Chambers* to *Acevedo*, reveals that the rationale for allowing a vehicle to be searched without a warrant is rooted in practical concerns unique to automobiles. Further, the rationale for allowing any containers located in a vehicle to be searched without a warrant is also specific to the automobile context. As we now explain, these rationales are distinct, and neither supports the analogy drawn in *McKinnon* between automobiles and packages consigned for shipment.

## 1.

As noted, *McKinnon* said that because "all goods or chattels consigned to a common carrier for shipment . . . are no less movable than an automobile, the reasons for the rule permitting a warrantless search of a vehicle upon probable cause are equally applicable to the search of such a chattel." (*McKinnon*, *supra*, 7 Cal.3d at p. 909.) In concluding that "a chattel . . . remains 'mobile' in the constitutional sense despite its limited and voluntary bailment to a common carrier," *McKinnon* relied on *Chambers*'s statement that the mobility of a car "still obtain[s]" after it has been seized. (*McKinnon*, at p. 910, citing *Chambers*, *supra*, 399 U.S. at p. 52.) In *Ross*, however, the high court acknowledged that this statement in *Chambers* was something of a legal fiction. Although exigent

16

circumstances may justify *seizing* a moving automobile without a warrant, *Ross* explained, "once a vehicle itself has been stopped the exigency does not necessarily justify a warrantless *search*." (*Ross*, *supra*, 456 U.S. at p. 807, fn. 9, citing *Chambers*, at pp. 62–64 (conc. & dis. opn. by Harlan, J.).) *Ross* clarified that the reason for permitting a warrantless search of a lawfully stopped vehicle is not that the vehicle retains its mobility, but that the "practicalities" of "forc[ing] police officers in every case either to post guard at the vehicle while a warrant is obtained or to tow the vehicle itself to the station" — "which often could leave the occupants stranded on the highway" — are too burdensome to justify a rule allowing police, upon probable cause, only to seize but not to search a vehicle without a warrant. (*Ross*, at p. 807, fn. 9.)

*Ross* echoed *Sanders*'s concern that such a rule would require "police departments of all sizes around the country to have available the people and equipment necessary to transport impounded automobiles to some central location until warrants could be secured. Moreover, once seized automobiles were taken from the highway the police would be responsible for providing some appropriate location where they could be kept, with due regard to the safety of the vehicles and their contents, until a magistrate ruled on the application for a warrant. Such a constitutional requirement therefore would have imposed severe, even impossible, burdens on many police departments." (*Sanders*, *supra*, 442 U.S. at p. 765–766, fn. 14; see also *Chadwick*, *supra*, 433 U.S. at p. 13, fn. 7 [noting difficulty of providing "[a]bsolutely secure storage facilities" for automobiles].) *Sanders* observed that these practical concerns limit the rationale of *Chambers* to automobiles (*Sanders*, at p. 765, fn. 14), and it is notable that after *Sanders* and *Ross*, the high court in *Acevedo* did not explain the holding in *Chambers* on the basis of a vehicle's continuing mobility after it has been seized. (See *Acevedo*, *supra*, 500 U.S. at pp. 569–570.) Instead, *Acevedo* explained that the later

17

warrantless search at the police station in *Chambers* "derived from" the authority to conduct "an immediate search without a warrant at the moment of seizure" (*Acevedo*, at p. 570) — authority that stems from the practical difficulties of transporting and securely storing an automobile pending issuance of a search warrant. (See *ibid.* [describing *Chambers* as having "reasoned . . . that the police could search later whenever they could have searched earlier, had they so chosen"].)

The high court's refinement of the rationale for *Chambers*'s holding undermines *McKinnon*'s purported analogy between automobiles and containers consigned for shipment. The analogy rests on *McKinnon*'s observation that such containers "are no less movable than an automobile." (*McKinnon*, *supra*, 7 Cal.3d at p. 909.) But it is clear from *Sanders* and *Ross* that the justification for a warrantless search of an automobile after it has been lawfully stopped turns not on its continuing mobility but instead on the practical difficulties of towing, storing, and securing a car, and providing for the safety of its stranded occupants, pending the issuance of a search warrant. Such difficulties do not generally apply to packages consigned for shipment, and there is no evidence in the record before us that the police had any difficulty in bringing the FedEx package to the police station and securely storing it there pending issuance of a search warrant.

In sum, absent unusual circumstances where transporting or storing a container poses practical difficulties for law enforcement, the concerns justifying an immediate warrantless search of a lawfully stopped automobile do not apply to packages consigned for shipment. In this case, there is no dispute as to whether the police lawfully seized the package without a warrant. Because there was no justification for an immediate search of the package once it was seized, the police had no derivative authority to search the package later at the police station without a warrant.

18

## 2.

Nor do the container searches upheld in *Ross* and *Acevedo* lend credence to *McKinnon*'s theory that the mobility of packages consigned for shipment provides a basis for a warrantless search.  Neither *Ross* nor *Acevedo* relied on the mobility of a container found in an automobile as the ground for upholding a warrantless search.

In *Ross*, the high court held that when police have probable cause to believe a vehicle is carrying evidence or contraband, the scope of a search may extend to "every part of the vehicle that might contain the object of the search," including the glove compartment, the trunk, and even the upholstery.  (*Ross*, *supra*, 456 U.S. at p. 821; see *id.* at pp. 804–805 [*Carroll* upheld a search where police tore open a car's upholstery to find contraband].)  *Ross* saw no distinction between the closed compartments of a car and a closed container found in a car in terms of their utility for stowing contraband or the privacy interests affected.  (*Ross*, at pp. 820–821, 823.)  If a car's closed compartments may be opened without a warrant during a lawful vehicle search, the high court reasoned, then closed containers found during a lawful vehicle search may be opened as well.  (*Id.* at p. 824 [scope of automobile search "is not defined by the nature of the container in which the contraband is secreted" but "by the object of the search and the places in which there is probable cause to believe that it may be found"].)

In reaching this holding, *Ross* nowhere suggested that seizing or storing a container posed any of the practical difficulties associated with towing and impounding an automobile pending issuance of a search warrant.  But *Ross* did rely on practical concerns unique to containers found in the course of a lawful automobile search.  In rejecting a rule that would allow police to search the entire vehicle but require any containers found to be taken to a magistrate, *Ross* observed that "prohibiting police from opening immediately a container in which the object

19

of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests. Moreover, until the container itself was opened the police could never be certain that the contraband was not secreted in a yet undiscovered portion of the vehicle; thus in every case in which a container was found, the vehicle would need to be secured while a warrant was obtained." (*Ross*, *supra*, 456 U.S. at p. 821, fn. 28.) It is thus apparent that *Ross*'s reasoning applies specifically to containers found during an automobile search and not to movable containers generally.

The same is true of *Acevedo*. In allowing police to open a container in a car where probable cause extends only to the container and not the car, *Acevedo*, like *Ross*, did not rely on the mobility of such containers or on any suggestion that containers pose the kind of practical problems associated with seizing and storing an automobile pending a search warrant. Instead, the high court explained that having held in *Ross* that police may open a container found in the course of a general vehicle search, it could see "no principled distinction" between such a container and "a container found in a car after a limited search for the container." (*Acevedo*, *supra*, 500 U.S. at p. 574; see *ibid.* [both types of containers "are equally easy for the police to store and for the suspect to hide or destroy"].) As in *Ross*, the high court in *Acevedo* said that prohibiting police from opening a container found in a car may "disserve privacy interests." (*Acevedo*, at p. 574.) "At the moment when officers stop an automobile, it may be less than clear whether they suspect with a high degree of certainty that the vehicle contains drugs in a bag or simply contains drugs. If the police know that they may open a bag only if they are actually searching the entire car, they may search more extensively than they otherwise would in order to establish the general probable cause required by *Ross*. [¶] . . . We cannot see the benefit of a rule that requires

20

law enforcement officers to conduct a more intrusive search in order to justify a less intrusive one." (*Id.* at pp. 574–575.)

With this passage and others, *Acevedo* made clear that its rationale and holding pertained specifically to containers in the context of automobile searches. In rejecting the relevance of cases concerning other container searches, *Acevedo* said: "From *Carroll* through *Ross,* this Court has explained that automobile searches differ from other searches." (*Acevedo*, *supra*, 500 U.S. at p. 578.) Further, the court said: "Our holding today neither extends the *Carroll* doctrine nor broadens the scope of the permissible automobile search delineated in *Carroll*, *Chambers*, and *Ross.* It remains a 'cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." ' [Citation.] We held in *Ross*: 'The exception recognized in *Carroll* is unquestionably one that is "specifically established and well delineated." ' [Citation.]" (*Acevedo*, at p. 580.) And perhaps most pointedly, *Acevedo* explained its holding as follows: "Until today, this Court has drawn a curious line between the search of an automobile that coincidentally turns up a container and the search of a container that coincidentally turns up in an automobile. The protections of the Fourth Amendment must not turn on such coincidences. We therefore interpret *Carroll* as providing one rule to govern all *automobile searches*." (*Ibid.*, italics added.)

Thus, in overruling *Chadwick* and *Sanders*, *Acevedo* rejected the view that containers found in cars are subject to the same Fourth Amendment rules that apply to container searches generally. However, in bringing all containers found in cars within the ambit of the automobile exception, *Acevedo* expressly limited its holding to automobile searches and did not disturb the general rule that a warrant is required to search a lawfully seized container. Nothing in the automobile-

21

specific reasoning of *Ross* and *Acevedo* invites an extension of those holdings to permit the warrantless search of a sealed package consigned for shipment.

**D.**

In the midst of developing its jurisprudence on container searches in the context of automobiles, the high court had occasion to consider the applicability of the Fourth Amendment to containers outside of the automobile context. (See *Jacobsen*, *supra*, 466 U.S. 109; *United States v. Place* (1983) 462 U.S. 696 (*Place*).) These cases confirm that a warrant is required to search a package consigned for shipment once it has been lawfully seized.

In *Place*, federal agents met a suspicious airline passenger at his destination and asked to search his luggage. (*Place*, *supra*, 462 U.S. at p. 698.) When the passenger refused, the agents seized his bags and transported them to another location for a "sniff test" by a narcotics detection dog. Ninety minutes later, the test was performed, and the dog alerted to one of the bags, whereupon the agents obtained a search warrant, opened the bag, and discovered cocaine. (*Id.* at p. 699.) The high court held that the officer's reasonable suspicion justified an investigative detention of the luggage and that the canine sniff did not constitute a search under the Fourth Amendment. (*Id.* at pp. 706–707.) But the court also held that the 90-minute detention of the suspect's luggage in order to conduct the sniff test exceeded the permissible scope of the investigative detention. (*Id.* at pp. 709–710.)

In setting forth the applicable principles, *Place* said: "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, *pending issuance of a warrant to examine its contents*, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present."

22

(*Place*, *supra*, 462 U.S. at p. 701, italics added.)  In other words, exigent circumstances can justify the seizure of a container without a warrant, but the container, once seized, cannot be searched without "issuance of a warrant to examine its contents."  (*Ibid.*)  In support of this general rule, *Place* cited *Sanders* and *Chadwick*.  As noted, *Acevedo* overruled *Sanders* and *Chadwick* insofar as they applied the warrant requirement to containers found in cars.  But *Acevedo*, in exempting containers found in cars, did not call into question the general rule for container searches that was stated by *Place* and recognized by *Sanders* and *Chadwick*.  (See *ante*, at pp. 20–21.)  Indeed, even as it overruled *Sanders* and *Chadwick* with respect to container searches in the automobile context, *Acevedo* distinguished *Place* on the ground that *Place* "did not involve an automobile at all."  (*Acevedo*, *supra*, 500 U.S. at p. 577; see *id.* at p. 578 ["*Place* had nothing to do with the automobile exception and is inapposite."].)  The general rule stated by *Place* thus remains good law.

One year after *Place*, the high court decided *Jacobsen*, *supra*, 466 U.S. 109. In that case, FedEx employees opened a package that had been damaged by a forklift.  Upon discovering plastic bags with white powder packed inside a tube with crumpled newspaper, the employees notified law enforcement.  When a federal agent arrived, he found the package with the top open and one end of the tube slit open.  He removed the plastic bags from the tube and saw the white powder.  He then opened the bags and conducted a field test that identified the powder as cocaine.  (See *id.* at pp. 111–112.)

The high court held that the initial opening of the package by the FedEx employees "did not violate the Fourth Amendment because of their private character."  (*Jacobsen*, *supra*, 466 U.S. at p. 115.)  The court then held that because the private search had eliminated any privacy interest in the contents of the package, the agent's handling of the package and its contents was lawful

23

insofar as it did not exceed the scope of the private search. (*Id.* at p. 119 [agent's "manual inspection of the tube and its contents" did "not tell him anything more than he already had been told" by the FedEx employees]; *id.* at p. 121 [seizure was reasonable because "respondents' privacy interest in the contents of the package had been largely compromised . . ."].) Finally, the court held that "[a] chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." (*Id.* at p. 123.)

*Jacobsen* prefaced its analysis with the following precepts: "When the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an 'effect' within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. *Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.* Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered." (*Jacobsen*, *supra*, 466 U.S. at p. 114, italics added and fns. omitted.) In support of the italicized rule, the high court cited *Place* as well as *Ross*, *Sanders*, and *Chadwick*. (*Jacobsen*, at p. 114, fn. 8.) *Jacobsen*'s affirmation of the general rule casts further doubt on *McKinnon* because if the mobility of a container consigned for shipment were enough to justify a warrantless search, as *McKinnon* held, then *Jacobsen*'s entire analysis upholding the agent's inspection of the package and its contents would have been unnecessary.

Since *Jacobsen*, the issue of whether a package consigned for shipment may be searched without a warrant appears to have arisen infrequently, and the

few reported cases on point have concluded that a warrant is required. In *Daniels v. Cochran* (Fla.Dist.Ct.App. 1995) 654 So.2d 609 (*Daniels*), a police officer opened a package to which a drug-sniffing dog alerted during "routine package checks on a conveyor belt at a Federal Express office." (*Id.* at p. 611.) The court held that "[w]hile [the officer] may have been entitled to seize the package based on the dog's alert without a warrant, his opening of the package without a warrant violated the Fourth Amendment . . . ." (*Id.* at p. 613.) Distinguishing *Acevedo*'s exception for warrantless searches of automobiles and their contents, the court said that "a canine sniff which alerts to a package does not eliminate the requirement that, absent exigent circumstances, consent or other recognized exceptions, a search warrant must be obtained before a search of the contents of the package passes constitutional muster. *See* [*Place*, *supra*, 462 U.S. at pp. 706–707]." (*Daniels*, at p. 613.)

In *Seeley v. State* (Ala.Crim.App. 1995) 669 So.2d 209 (*Seeley*), a FedEx employee, Kaufmann, opened an undeliverable box and found a tubular package inside. He did not open the tube but squeezed it, felt a powdery substance he suspected to be drugs, and called the police. An officer, Ware, arrived with a drug-sniffing dog that alerted to the tube. The officer then took the tube to his office. There, he opened it and performed a test on the powder that indicated the presence of cocaine. (*Id.* at p. 211.) The court invalidated the search: "Under *Jacobsen*, Ware exceeded the scope of Kaufmann's search when he cut open the tube in the appellant's package without a search warrant. *Jacobsen* establishes that a legitimate expectation of privacy exists in sealed packages sent by common carrier and that a warrantless government search cannot exceed what was carried out by private parties. Ware should have obtained a search warrant before cutting open the tubular package that contained cocaine. Ware had probable cause to obtain a search warrant based on his observations and the results of the 'sniff test'

25

by the narcotics detection dog.  Because Ware had dominion and control over the package, there was little chance of loss or destruction of the package.  There were no exigent circumstances that justified opening the package before obtaining a search warrant."  (*Id.* at pp. 213–214.)

In contrast to the warrantless searches held unlawful in *Daniels* and *Seeley*, the conduct of law enforcement in many other cases suggests that it is common practice, consistent with *Place* and *Jacobsen*, to obtain a warrant before searching a container consigned for shipment.  (See, e.g., *United States v. Robinson* (6th Cir. 2004) 390 F.3d 853, 858–859 [police obtained a warrant to open a package in shipment that smelled of marijuana]; *Unites States v. Logan* (8th Cir. 2004) 362 F.3d 530, 531–532 [police obtained a warrant to open a package at a mailbox facility after narcotics dog alerted to the package]; *Unites States v. Morones* (8th Cir. 2004) 355 F.3d 1108, 1109 [police obtained a warrant to search a package detained at a FedEx facility]; *United States v. Smith* (7th Cir. 1994) 34 F.3d 514, 516 [police obtained a warrant to search a FedEx package after a canine alert]; *United States v. Hall* (10th Cir. 1994) 20 F.3d 1084, 1085 [same].)

The District Attorney asserts, without citation to any authority, that *McKinnon* "is still good law and has been followed by numerous courts."  In fact, there appear to be only two California cases that have applied *McKinnon* to uphold the warrantless search of a container based on its mobility, and both predate the development of the law in *Chadwick*, *Sanders*, *Place*, and *Jacobsen*.  (See *People v. Goodyear* (1975) 54 Cal.App.3d 157, 162; *People v. Superior Court* (*Reilly*) (1975) 53 Cal.App.3d 40, 51–52.)  To buttress *McKinnon*, the District Attorney relies on *United States v. Johnston* (9th Cir. 1974) 497 F.2d 397, which upheld the warrantless search of two suitcases on a departing train.  But *United States v. Johnston* also predates the line of cases from *Chadwick* to *Jacobsen*.  The District Attorney also relies on *United States v. Johns* (1985) 469 U.S. 478 (*Johns*), which

26

applied *Ross* to uphold the delayed search of packages found in two lawfully seized pickup trucks.  But because *Johns* is an automobile search case, it lends no support to *McKinnon*'s holding for reasons already discussed.

*McKinnon*'s rule that the mobility of a container is itself sufficient to justify a warrantless search has not been followed by any appellate court in California for almost four decades.  This is unsurprising in light of subsequent developments that have undermined *McKinnon*'s analogy between the mobility of cars and the mobility of containers as the basis for a warrantless search.  We conclude that *McKinnon*, *supra*, 7 Cal.3d 899 is no longer to be followed on this point.  A container consigned for shipment is subject to the same rule as other containers outside of the specific and well-delineated context of an automobile search:  "Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." (*Jacobsen*, *supra*, 466 U.S. at p. 114, fn. omitted; see *Place*, *supra*, 462 U.S. at p. 701.)

In the present case, the mobility of the package constituted exigent circumstances justifying Officer Totorica's seizure of the FedEx package without a warrant so long as he had probable cause to believe it contained contraband.  But seizure of the package by the police negated its mobility.  Absent some other exception to the warrant requirement, the Fourth Amendment required the police to obtain a search warrant before opening the package after it had been seized.

## III.

In addition to invoking exigent circumstances, the District Attorney argues that the plain smell of marijuana emanating from the package was, by itself, sufficient justification for the warrantless search.  As we explain, however, we do not decide this issue because the District Attorney forfeited the argument by

27

failing to raise it in opposition to petitioner's suppression motion in the superior court.

In order to understand our finding of forfeiture here, it is important to distinguish between two different legal claims involving the sense of smell. The first is that a distinctive odor can provide probable cause to believe that a closed container contains contraband. This proposition is well established by cases that have found the smell of contraband sufficient to establish the probable cause necessary for police to obtain a search warrant (see *Johnson v. United States* (1948) 333 U.S. 10, 13) or to conduct a search or seizure under the automobile or exigent circumstances exception to the warrant requirement (see *People v. Cook* (1975) 13 Cal.3d 663, 668–670, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390; *People v. Gale* (1973) 9 Cal.3d 788, 794; *United States v. McCoy* (8th Cir. 2000) 200 F.3d 582, 584; *United States v. Downs* (10th Cir. 1998) 151 F.3d 1301, 1303; *U.S. v. Pierre* (5th Cir. 1992) 958 F.2d 1304, 1310; *Gilliam v. United States* (D.C. 2012) 46 A.3d 360, 364; *Dies v. State* (Miss. 2006) 926 So.2d 910, 918; *People v. Kazmierczak* (Mich. 2000) 605 N.W.2d 667, 672; *State v. Moore* (Ohio 2000) 734 N.E.2d 804, 807–808 & fns. 1, 2 [collecting cases]).

The second claim is that the plain smell of marijuana *by itself* justifies the search of a container without a warrant, separate and apart from any other exception to the warrant requirement. Here the claim is not that the smell of marijuana can establish the probable cause necessary to obtain a warrant or to invoke an exception to the warrant requirement, but that the police simply do not need a warrant to search a package that reeks of marijuana. It is this claim that the District Attorney presses in this court but failed to raise in the superior court.

In opposing petitioner's motion to suppress in the trial court, the District Attorney argued that the smell of marijuana constituted probable cause to support

28

the seizure and search of the package without a warrant in light of exigent circumstances arising from the package's mobility. In support of this argument, the District Attorney offered Officer Totorica's testimony that the package smelled of marijuana and that "[t]he odor was stronger as I got closer to the package." Officer Totorica also testified that he smelled marijuana upon entering the store and that the entry was an "estimated 25 feet" from the package, although these assertions were not included in his incident report. Lieutenant Haley similarly testified that "there was a distinct odor of marijuana coming from [the package]." Both officers said they were trained and experienced in smelling marijuana. The smell was also apparent to the store employee, Nancy Her, who did not indicate she had any special training.

The trial court upheld the seizure of the package under the exigent circumstances exception to the warrant requirement, and this ruling is fairly understood to encompass a determination that the evidence adduced at the suppression hearing established probable cause that the package contained contraband. As noted, petitioner does not challenge the legality of the seizure — and for good reason: The trial court's implicit finding of probable cause is supported by substantial evidence, and the existence of probable cause, together with the exigent circumstance of the package's mobility, justified Officer Totorica's seizure of the package without a warrant. (See *Place*, *supra*, 462 U.S. at p. 701.) As for the subsequent search, the trial court upheld it on the basis of inevitable discovery, but the Court of Appeal rejected that theory and the District Attorney does not defend it here.

After petitioner sought a writ of mandate in the Court of Appeal, the Court of Appeal on its own initiative issued a letter to the parties requesting an informal response to several questions, including the following: "Do the courts recognize a 'plain smell' doctrine that would have allowed the search and seizure of the

package without a warrant?" This was the first time in the case that the parties were asked to consider whether the smell of marijuana could alone provide an independent and sufficient basis for a warrantless search or seizure, and not just a basis for establishing probable cause. The District Attorney responded in the affirmative, and the parties proceeded to brief and argue this issue in the Court of Appeal. The Court of Appeal dedicated a significant portion of its opinion to rejecting the theory that the plain smell of marijuana can alone justify a warrantless search, and the District Attorney then sought our review on this issue.

In this court, the District Attorney argues that the plain smell of marijuana negated any reasonable expectation of privacy in the package, drawing an analogy to the following dictum in a footnote from the United States Supreme Court's decision in *Sanders*: "Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." (*Sanders*, *supra*, 442 U.S. at p. 765, fn. 13; see *Robbins v. California* (1981) 453 U.S. 420, 428 (plur. opn.) ["to fall within the [exception described in *Sanders*'s footnote] a container must so clearly announce its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer"], revd. on other grounds by *Ross*, *supra*, 456 U.S. 798.) Although some courts, relying on *Sanders* or *Robbins*, have held that the plain smell of contraband justifies the search of a closed container without a warrant (see *United States v. Haley* (4th Cir. 1982) 669 F.2d 201, 204, fn. 3; *United States v. Epps* (11th Cir. 2010) 613 F.3d 1093, 1098), other courts have rejected this view (see *United States v. Johns* (9th Cir. 1983) 707 F.2d 1093, 1096, revd. on other grounds by *Johns*, *supra*, 469 U.S. at p. 487; *United States v. Dien* (2d Cir. 1979) 609 F.2d 1038, 1045). Since

30

*Sanders*, neither the United States Supreme Court nor this court has ever upheld a warrantless search of a closed container solely on the ground that its smell, appearance, or other outward characteristic clearly announced its contents. Thus, it is fair to say that the legal theory urged by the District Attorney is unsettled in the extant case law and novel in this court's jurisprudence.

Although it is not improper for a reviewing court to decide the merits of an alternate ground for affirming the judgment of a trial court even if that ground was not argued by the parties below (see, e.g., *People v. Robles* (2000) 23 Cal.4th 789, 800–801 & fn. 7), we have cautioned that appellate courts should not consider a Fourth Amendment theory for the first time on appeal when "the People's new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence" or when "the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition." (*Green v. Superior Court* (1985) 40 Cal.3d 126, 137–138.) In this case, although the facts adduced at the suppression hearing were sufficient to establish probable cause that the package contained contraband, the evidence on the issue of smell was not extensive. Neither the District Attorney nor the defense offered evidence that provided any depth or detail concerning the intensity or other qualities of the smell detected by the officers. Nor does the record contain much information about the extent or limitations of the officers' training or experience in detecting marijuana through the sense of smell. Because the District Attorney did not raise the plain smell theory at the suppression hearing, the parties had no occasion to put forward the most probative evidence for or against the proposition that the plain smell of marijuana was, by itself, sufficient to justify the warrantless search. In light of the limited record before us, we decline to resolve whether the smell of marijuana can alone justify the warrantless search of a closed container and, if so, under what circumstances.

The way the plain smell issue arose in this case prompts us to caution appellate courts against proposing, on their own initiative, novel theories that the parties did not address in the course of litigating a motion to suppress in the trial court. Our admonition is rooted in principles of judicial restraint, which have particular salience when courts are confronted with unsettled constitutional issues. " 'In an emerging area of the law, we do well to tread carefully and exercise judicial restraint, deciding novel issues only when the circumstances require.' " (*Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 881, quoting *Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 20, fn. 6.)

## CONCLUSION

For the reasons above, we conclude that the seizure of the package was lawful but the warrantless search of the sealed package was not justified by exigent circumstances and that the District Attorney forfeited the argument that the plain smell of marijuana alone justified the search without a warrant. Because the Court of Appeal's decision did not distinguish between evidence obtained from the impermissible warrantless search and any evidence that might have been obtained from the permissible warrantless seizure, we affirm in part and reverse in part the judgment of the Court of Appeal and remand the matter to that court with

directions to issue a peremptory writ of mandate.  The peremptory writ shall direct the superior court to vacate its order denying petitioner's motion to suppress evidence and conduct further proceedings consistent with this opinion.


                                        LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
             KENNARD, J.
             BAXTER, J.
             WERDEGAR, J.
             CHIN, J.
             CORRIGAN, J.

33

**CONCURRING OPINION BY LIU, J.**

As today's opinion explains, there is an important difference between two kinds of smell-related claims. One is that the detection of a distinctive odor through a police officer's sense of smell may establish probable cause that a closed container holds contraband. This proposition is well established. (See *Johnson v. United States* (1948) 333 U.S. 10, 13 [smell of contraband may support probable cause where the officer is "qualified to know the odor, and [the odor] is one sufficiently distinctive to identify a forbidden substance"].) The other, quite different claim is that the plain smell of contraband is sufficient by itself, apart from any other exception to the warrant requirement, to justify opening a closed container without a search warrant. This proposition, which is not well established, is said by some courts and the District Attorney here to rest on an analogy to the plain view doctrine in Fourth Amendment law. I write separately to explain why this analogy is inapt and to elucidate concerns that should give courts pause before authorizing warrantless searches of closed containers based solely on the smell of contraband.

**I.**

The difference between a seizure and a search underlies the disanalogy between the plain view doctrine and the purported plain smell justification for opening a closed container without a warrant. The plain view doctrine holds that an officer may seize an object in plain view without a warrant so long as the officer is lawfully present in the place from which the object is viewed, the

1

incriminating nature of the object is immediately apparent, and the officer has a lawful right of access to seize the object. (See *Horton v. California* (1990) 496 U.S. 128, 136–137 (*Horton*).) As the high court has explained, the officer's conduct in such circumstances does not invade any Fourth Amendment privacy interest; it invades only the owner's possessory interest in the object. (*Horton*, at pp. 133–134.) This distinction elucidates why the plain view doctrine is a doctrine about seizures, not searches: "The 'plain-view' doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. [Citations.] A seizure of the article, however, would obviously invade the owner's possessory interest. [Citations.] If 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches." (*Id.* at pp. 133–134, fns. omitted.)

This difference between seizures and searches was recognized in one of our early Fourth Amendment cases addressing the issue of smell. In *People v. Marshall* (1968) 69 Cal.2d 51 (*Marshall*), the court rejected the argument that police could dispense with the warrant requirement when opening a closed container based on the smell of marijuana. The officers in *Marshall* entered an apartment to arrest a suspect for the sale of marijuana to an informant. No one was inside the apartment when they arrived, but an officer "detected a sweet odor" coming from a closed paper bag located in an open cardboard box inside an open bedroom closet. (*Id.* at p. 55.) The odor was similar to the smell of the marijuana previously sold to the informant. The officers opened the bag and found 21 plastic bags of marijuana.

2

In an opinion by Chief Justice Traynor, the court stated the general rule that "police officers may seize contraband evidence 'in plain sight' " and observed that "[u]nder such circumstances there is, in fact, no search for evidence." (*Marshall*, *supra*, 69 Cal.2d at p. 56.)  But the marijuana in *Marshall* was not in plain sight; it was concealed inside a brown paper bag.  (*Id.* at pp. 56–57.)  In response to the Attorney General's argument that "the marijuana should . . . be deemed to have been in plain view of the officer" based on its odor, the court reasoned as follows: "[The Attorney General's] contention overlooks the difference between probable cause to believe contraband will be found, which justifies the issuance of a search warrant, and observation of contraband in plain sight, which justifies seizure without a warrant.  However strongly convinced officers may be that a search will reveal contraband, their belief, whether based on the sense of smell or other sources, does not justify a search without a warrant." (*Id.* at p. 57.)

The court further explained:  "In the present case the brown paper bag itself was not contraband.  Only by prying into its hidden interior [citation] could the officer be sure that he was seizing contraband and nothing more.  The fact that the container was only a brown paper bag instead of a packing box, purse, handbag, briefcase, hatbox, snuffbox, trunk, desk, or chest of drawers [citation] is immaterial.  It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of.  A search of the container is necessary to disclose its contents.  A search demands a search warrant.

"Of course officers may rely on their sense of smell to confirm their observation of already visible contraband.  [Citations.]  To hold, however, that an odor, either alone or with other evidence of invisible contents[,] can be deemed the same as or corollary to plain view, would open the door to snooping and

3

rummaging through personal effects.  Even a most acute sense of smell might mislead officers into fruitless invasions of privacy where no contraband is found.

"Moreover, however keen their sense of smell, officers cannot seize the thing they smell until they find it after looking for and through the places from which the odor emanates.  In short, they must still conduct a search. . . .  'In plain smell,' therefore, is plainly not the equivalent of 'in plain view.' " (*Marshall*, *supra*, 69 Cal.2d at pp. 58–59.)

Although *Marshall*'s authority as precedent was arguably undermined by a four-justice concurring opinion in *Guidi v. Superior Court* (1973) 10 Cal.3d 1 (*Guidi*) urging that *Marshall* be overruled (see *Guidi*, at p. 19 (conc. opn. by Mosk, J.)), *Guidi* involved facts different from those in *Marshall*.  The police in *Guidi*, after learning from an informant that two individuals suspected of selling hashish from a shopping bag were inside an apartment, entered the apartment and arrested the two suspects in the living room.  One of the officers, Holt, then moved from the living room to the kitchen to investigate sounds coming from the rear of the apartment.  In the kitchen, Officer Holt saw a shopping bag in plain view that smelled of hashish, and "[s]eizing the bag he found the 10 'baggies' of hashish within." (*Id.* at p. 5 (lead opn.).)  On these facts, the court unanimously concluded that "the exigencies of the situation" — the possibility that other suspects remained in the apartment to protect the contraband — justified the warrantless search.  (*Id.* at p. 19; see *ibid.* ["Having seen the described container of contraband in plain sight, Officer Holt was justified in ascertaining if it still contained the hashish, so as to evaluate the continuing danger of its violent defense."].)

To the extent *Marshall* suggested that the smell of contraband coupled with exigent circumstances would not justify a warrantless search, *Guidi* said "it is no longer to be followed." (*Guidi*, *supra*, 10 Cal.3d at p. 17, fn. 18; see *People v. Cook* (1975) 13 Cal.3d 663, 668, fn. 4 (*Cook*) ["the result in *Guidi* was a *pro tanto*

4

overruling of *Marshall as to the particular issue*" (italics added)], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) But *Marshall* itself, unlike *Guidi*, did not involve exigent circumstances, and none of our cases since *Guidi* has called into question *Marshall*'s holding that "[h]owever strongly convinced officers may be that a search will reveal contraband, their belief, whether based on the sense of smell or other sources, does not justify a search without a warrant" absent an established exception to the warrant requirement. (*Marshall*, *supra*, 69 Cal.2d at p. 57.) Further, Chief Justice Traynor's lucid reasoning in *Marshall*, which carefully distinguished between a plain-view seizure and a plain-smell search, correctly anticipated the high court's understanding that the plain-view seizure of a container "does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant [citations], or one of the well-delineated exceptions to the warrant requirement. [Citations.]" (*Horton*, *supra*, 496 U.S. at p. 141, fn. 11.)

Like the observation of an object in plain view, the detection of the plain smell of marijuana does not involve any intrusion on privacy. No search has occurred within the meaning of the Fourth Amendment when an officer simply uses his nose to smell the odor of marijuana emanating from a closed container. However, unlike the mere act of sensory detection through sight or smell, the act of opening a closed container to expose its contents — whether it turns out to be contraband or something else — typically involves an intrusion on privacy and constitutes a search. The sense of smell, no less than any of the other senses, may give rise to probable cause to search. But probable cause ordinarily supports the issuance of a search warrant; it does not obviate the need for one.

There is nothing anomalous in the fact that the smell of contraband may be sufficient to justify opening a package with a warrant yet insufficient to justify

5

opening it without a warrant. That is equally true of an informant's tip, a police officer's observation, or any other evidence supplying probable cause to conduct a search that is subject to the warrant requirement. The degree of suspicion supporting a search may be the same whether it is asserted beforehand in a warrant application or after the fact at a suppression hearing. But there is an important difference between requiring law enforcement officials to articulate their suspicion *before* searching for contraband and permitting officials to articulate their ex ante suspicion *after* contraband has already been found. That difference is a key reason why the law imposes the warrant requirement as a safeguard against excessive zeal or misconduct by law enforcement.

Further, it is no answer to say that the distinctive odor of marijuana may enable a trained officer to tell with virtual certainty what is inside a closed container, for the same degree of certainty might arise through a tip from an unfailingly reliable informant. In neither case does the accuracy of the officer's suspicion bring the contents of a closed container into plain view such that seizure of those contents involves no search. As the high court has repeatedly said, even where " '[i]ncontrovertible testimony of the senses . . . may establish the fullest possible measure of probable cause,' " the settled rule is that " 'no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances" ' " or some other established exception to the warrant requirement. (*Horton*, *supra*, 496 U.S. at p. 137, fn. 7, quoting *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 468.)

## II.

Against this legal backdrop, the District Attorney contends that neither the act of smelling the package *nor the act of opening it* constitutes a search within the meaning of the Fourth Amendment because there is no reasonable expectation of privacy in a sealed package that reeks of marijuana. The argument is that no

6

search warrant is required because no search occurs when police open a package whose contents have already announced themselves through their distinctive odor.

The United States Supreme Court has not resolved whether odor alone might negate a reasonable expectation of privacy in a sealed package, although the court flagged this issue in *United States v. Johns* (1985) 469 U.S. 478, 481 (*Johns*). There, customs officers investigating a drug smuggling operation smelled marijuana coming from two pickup trucks in which they also saw distinctive green packages consistent with a common means of wrapping marijuana. The officers seized the trucks and removed the packages, opening them three days later without a warrant. The high court upheld the warrantless search because the odor and sight of the packages gave the officers probable cause to search the trucks under the automobile exception to the warrant requirement. (*Id.* at p. 487.) The court acknowledged but did not address the argument that the odor of marijuana might negate an expectation of privacy in a closed container: "Whether respondents ever had a privacy interest in the packages reeking of marihuana is debatable. We have previously observed that certain containers may not support a reasonable expectation of privacy because their contents can be inferred from their outward appearance, [citing *Arkansas v. Sanders* (1979) 442 U.S. 753, 764–765, n. 13], and based on this rationale the Fourth Circuit has held that 'plain odor' may justify a warrantless search of a container. [(*United States v. Haley* (4th Cir. 1982) 669 F.2d 201, 203–204 & fn. 3, cert. denied (1982) 457 U.S. 1117.)] The Ninth Circuit, however, rejected this approach [below], [(*United States v. Johns* (9th Cir. 1983) 707 F.2d 1093, 1096)], and the Government has not pursued this issue on appeal. We need not determine whether respondents possessed a legitimate expectation of privacy in the packages." (*Johns*, *supra*, 469 U.S. at p. 486.)

In citing footnote 13 of *Sanders*, the high court in *Johns* was referring to the following dictum suggesting that there is no legitimate expectation of privacy

7

in a package whose contents can be inferred from its outward appearance:  "Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment.  Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.  Similarly, in some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant."  (*Arkansas v. Sanders*, *supra*, 442 U.S. at p. 765, fn. 13 (*Sanders*).)  The high court in *Sanders* offered this dictum in order to draw a contrast between the example of a gun case or burglary kit and the container at issue in that case:  a green suitcase with no outward indication of its contents.  (See *id.* at pp. 755, 763–764.)

A four-justice plurality in *Robbins v. California* (1981) 453 U.S. 420 (*Robbins*), reversed on other grounds by *United States v. Ross* (1982) 456 U.S. 798, elaborated on the Fourth Amendment exceptions suggested in footnote 13 of *Sanders*:  "The second of these exceptions," i.e., where a package's contents are open to plain view, "obviously refers to items in a container that is not closed.  The first exception is likewise little more than another variation of the 'plain view' exception, since, if the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view."  (*Robbins*, at p. 427 (plur. opn. by Stewart, J.).)  The *Robbins* plurality further elaborated:  "Expectations of privacy are established by general social norms, and to fall within the second exception of the footnote in question a container must so clearly announce its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer."  (*Id.* at p. 428.)  The *Robbins* plurality concluded that the exception did not apply on the facts there:  "If indeed a green plastic wrapping reliably indicates

that a package could only contain marihuana, that fact was not shown by the evidence of record in this case." (*Ibid.*)

Although footnote 13 of *Sanders* was dicta, various courts have relied on it to uphold warrantless searches of closed containers with distinctive configurations. For example, in *United States v. Banks* (8th Cir. 2008) 514 F.3d 769 (*Banks*), the court upheld the warrantless search of a gun case that was "readily identifiable" as such because it was " 'a molded plastic case, a configuration handgun manufacturers commonly use when initially packaging a firearm for the end consumer,' " and " 'had the manufacturer's name ["PHOENIX ARMS"], *clearly indicating an arms product*, imprinted on the entire length of the front of the case.' [Citation.]" (*Id.* at p. 775; see also *United States v. Taylor* (D.C. Cir. 2007) 497 F.3d 673, 680 [upholding warrantless search of gun case]; *United States v. Meada* (1st Cir. 2005) 408 F.3d 14, 23 [distinctively configured gun case rendered its contents "unambiguous"].) Other courts, however, have required a search warrant where a gun case, though recognized by trained officers, was not readily identifiable as such to lay observers. (See *United States v. Gust* (9th Cir. 2005) 405 F.3d 797, 803 (*Gust*) ["courts should assess the nature of a container primarily 'with reference to "general social norms" ' rather than 'solely . . . by the experience and expertise of law enforcement officers' "]; *United States v. Bonitz* (10th Cir. 1987) 826 F.2d 954, 956 [same].)

Beyond gun cases and other single-purpose containers, federal courts of appeals have divided on whether other indicia, apart from outward appearance, may negate a reasonable expectation of privacy in the contents of a closed container. For example, courts have disagreed on whether the label on a container may justify a warrantless search. (Compare *United States v. Morgan* (6th Cir. 1984) 744 F.2d 1215, 1222 ["the labels on the bottles of pills made it 'immediately apparent' to the agents that the items were evidence of a crime"] and *United States*

9

*v. Eschweiler* (7th Cir. 1984) 745 F.2d 435, 439 [envelope "*said* safe-deposit box key, and had the name of the bank on it"] with *United States v. Villarreal* (5th Cir. 1992) 963 F.2d 770, 776 ["a label on a container is not an invitation to search it" at least where the label does not indicate contraband].)

In addition, some cases have held that " 'the circumstances under which an officer finds the container may add to the apparent nature of its contents' " even when the container has no distinctive outward appearance. (*United States v. Davis* (4th Cir. 2012) 690 F.3d 226, 235; see *id.* at p. 236 [upholding warrantless search of a bag containing incriminating bloodstained clothes under a hospital bed where the officer knew "it was the practice and procedure of the hospital to place a patient's clothing in a bag on the shelf under his bed"].) But this approach has been criticized. (See *Gust*, *supra*, 405 F.3d at p. 802 [*Sanders* exception requires container to be evaluated "without regard for the context in which it is found or the fact that the searching officer had special reasons to believe the container held contraband"]; *United States v. Donnes* (10th Cir. 1991) 947 F.2d 1430, 1438 [invalidating search of a camera lens case even though "the officer's experience and training could have led him to infer that the camera lens case contained narcotics in light of the fact that it was found inside the glove with a syringe"]; *United States v. Sylvester* (5th Cir. 1988) 848 F.2d 520, 525 [invalidating search of a hunting box found at the scene of a suspected hunting offense because its "contents cannot be *inferred* from simply looking at the box"].) The latter cases limited the *Sanders* exception to containers whose contents may be inferred strictly from a container's outward appearance out of concern that "the exception could swallow the warrant requirement." (*Gust*, at p. 802; see *Banks*, *supra*, 514 F.3d at p. 774 [*Sanders* "exception is limited to those rare containers that are designed for a single purpose"].)

10

There is similar conflict among the few courts that have addressed whether the smell of contraband can alone negate a reasonable expectation of privacy in a closed container. In *United States v. Haley*, *supra*, 669 F.2d 201, the Fourth Circuit said that in addition to a container's outward appearance or distinctive configuration, "[a]nother characteristic which brings the contents into plain view is the odor given off by those contents." (*Id.* at p. 203.) The court upheld the search of opaque plastic garbage bags on the ground that their "distinctive configuration together with the intense marijuana odor brought" their contents into plain view. (*Id.* at p. 204.) But the court went on to say: "We do not imply that both distinctive configuration and odor are necessary to justify the search of the containers. This Court has previously held that odor alone is sufficient cause to search such containers as cardboard boxes." (*Id.* at p. 204, fn. 3, citing *United States v. Sifuentes* (4th Cir. 1974) 504 F.2d 845, 848 [interpreting "plain view" to mean "obvious to the senses" through odor as well as sight].) The Eleventh Circuit has also endorsed this view. (See *United States v. Epps* (11th Cir. 2010) 613 F.3d 1093, 1098 ["[W]e have upheld a warrantless search of closed, opaque packages that reeked of marijuana."].)

By contrast, the Ninth Circuit in *United States v. Johns* rejected the argument that because the smell of marijuana "brought that contraband into plain view," customs officers had authority to search closed packages without a warrant. (*United States v. Johns*, *supra*, 707 F.2d at p. 1096, revd. on other grounds by *Johns*, *supra*, 469 U.S. at p. 487.) While acknowledging that the smell of marijuana provided probable cause for a plain-view seizure of the packages, the Ninth Circuit said "[i]t is a different question . . . whether an opaque container that is properly seized may be searched." (*United States v. Johns*, 707 F.2d at p. 1095.) "Our precedent . . . directs that while the odor of marijuana smelled by the agents would contribute to probable cause to believe that the container held

11

contraband, a recognized exception to the warrant requirement was necessary to justify a warrantless search.  [Citation.]  The odor and circumstances of the seizure supplied the probable cause for a search warrant.  They did not eliminate the need for one." (*Id.* at p. 1096, fn. omitted.)  The court declined to apply the *Sanders* exception because "[t]he wrapped bales here did not announce their contents with sufficient clarity to eliminate the need for a warrant." (*Id.* at p. 1096, fn. 2.)  The Second Circuit has similarly rejected the contention that a distinctive odor can, by itself, bring the contents of a closed container into plain view.  (*United States v. Dien* (2d Cir. 1979) 609 F.2d 1038, 1045.)

In considering this split of authority, it is important to note that although courts have applied the *Sanders* dictum with varying results, the United States Supreme Court has never itself applied the *Sanders* dictum to uphold a warrantless search of a closed container on the theory that its outward appearance or any other characteristic announced its contents.  In California, only two published cases have applied the *Sanders* dictum to uphold a warrantless search; neither addressed the question before us.  (See *People v. Green* (1981) 115 Cal.App.3d 259 [upholding search of a gun case]; *People v. Johnson* (1981) 123 Cal.App.3d Supp. 26 [upholding search of a suitcase where defendant told officers it contained marijuana].)  In *People v. Chavers* (1983) 33 Cal.3d 462 (*Chavers*), this court, without citing *Sanders*, allowed an officer to open a plastic shaving kit after he had lawfully "lifted [it]" and "felt the outline of a gun." (*Chavers*, at p. 466.)  But *Chavers*, like *Guidi*, upheld the warrantless search in the context of exigent circumstances.  (*Chavers*, at p. 473 [the gun was "an extremely dangerous instrument posing significant and immediate risks both to the police and to members of the public in the immediately surrounding area"].)

*Chavers* relied on *Guidi* and on *People v. Lilienthal* (1978) 22 Cal.3d 891, which upheld the warrantless seizure of a distinctively folded square piece of

12

paper that fell from a suspect's wallet during a traffic stop. Noting the officer's "experience in making numerous arrests where cocaine or heroin was transported in paper bindles similar to the one dropped by defendant" (*id.* at p. 898), the court in *Lilienthal* concluded that the officer was "justified in making the plain view seizure of the paper" (*id.* at p. 899). But *Lilienthal* did not address whether it was lawful for the officer to open the paper after seizing it. *Chavers* also relied on *People v. Guy* (1980) 107 Cal.App.3d 593, where the officer "[u]pon lifting the baggie . . . was able to conclude it contained a controlled substance." (*Id.* at p. 599.) But there, the plastic baggie was transparent, and "[t]he contraband was in plain sight." (*Id.* at p. 600.)

The unsettled scope of the *Sanders* dictum and the great variety of factual scenarios potentially implicating it should give courts substantial pause before extending it to hold that a distinctive odor may negate any reasonable expectation of privacy in the contents of a closed container. (See *Flippo v. West Virginia* (1999) 528 U.S. 11, 13 [exceptions to the warrant requirement must be "narrow and well-delineated"]; *People v. Escudero* (1979) 23 Cal.3d 800, 811 ["the courts must ever be on their guard to keep [exceptions to the warrant requirement] within firm and narrow bounds"].) It may seem commonsensical to say that petitioner here could not have had a reasonable expectation of privacy in a sealed package that reeked of marijuana and turned out to contain marijuana. But it is a cardinal Fourth Amendment principle that "the 'reasonable person' test presupposes an *innocent* person." (*Florida v. Bostick* (1991) 501 U.S. 429, 438.) And it is not difficult to contemplate situations where the smell of marijuana emanating from a closed container does not clearly or accurately announce its contents.

For one thing, the record here does not indicate whether the package smelled of burned or unburned marijuana. Yet courts, including ours, have recognized "a commonsense distinction between the smells of burnt and raw

13

marijuana." (*United States v. Downs* (10th Cir. 1998) 151 F.3d 1301, 1303; see *Wimberly v. Superior Court* (1976) 16 Cal.3d 557, 571–572 (*Wimberly*); *State v. Larson* (Mont. 2010) 243 P.3d 1130, 1142; *Bailey v. State* (Md. 2010) 987 A.2d 72, 91; *Com. v. Waddell* (Pa.Super.Ct. 2012) 61 A.3d 198, 217–218; *Meek v. State* (Ind.Ct.App. 2011) 950 N.E.2d 816, 818; *Taylor v. State* (Fla.Dist.Ct.App. 2009) 13 So.3d 77, 79.)  Because "the smell of burnt marijuana is generally consistent with personal use of marijuana" (*Downs*, at p. 1303), the smell does not necessarily indicate the presence of marijuana when it emanates from a closed container.  As is familiar to anyone who has sat at a bar, in a lounge, or on an airplane before the widespread advent of smoking prohibitions, the permeation of smoke into clothes, purses, briefcases, backpacks, or other articles can leave a strong and lasting odor.  Similarly, an object or person present in a room, car, or other space where marijuana is burned may acquire a distinctive smell, even though the object or person does not hold marijuana.

Prior to the high court's decisions expanding the scope of automobile searches (see maj. opn., *ante*, at pp. 10–16), we held that "the odor of burnt marijuana" supported the reasonableness of searching a car's interior for evidence of "casual" or "personal" use of marijuana, but did not by itself provide reasonable grounds to search the vehicle's trunk for raw marijuana to be transported or sold. (*Wimberly*, *supra*, 16 Cal.3d at pp. 572–573.)  In *Wimberly*, we "differentiate[d] between the casual user and the dealer of narcotics" and explained that the smell of burned marijuana provided reason to suspect the former but not the latter.  (*Id.* at p. 572; accord, *United States v. Nielsen* (10th Cir. 1993) 9 F.3d 1487, 1491 [smell of burnt marijuana in car's passenger compartment did not provide probable cause to believe the car's trunk contained marijuana].)  As these cases suggest, the smell of burned marijuana emanating from a sealed package may indicate that the package or its contents have been in a place where marijuana was

14

consumed. But it does not necessarily indicate that the package contains marijuana. At the very least, it is questionable whether the smell "so clearly announce[s] its contents" as to render those contents "obvious to an observer" and thereby negate any reasonable expectation of privacy. (*Robbins*, *supra*, 453 U.S. at p. 428 (plur. opn.).)

Moreover, even assuming that an ordinary observer can distinguish between raw and burned marijuana, the fact that a sealed package smells of raw marijuana does not necessarily reveal that the package contains marijuana. Like the smell of burned marijuana, the smell of unburned marijuana may be due to a transferred or residual odor. In *People v. Gale* (1973) 9 Cal.3d 788 (*Gale*), the "defendant's clothing . . . smelled strongly of marijuana" (*id.* at p. 792), and "both officers testified they detected a strong odor of fresh marijuana apparently emanating from defendant's person." (*Id.* at p. 793, fn. 4.) But "[a] search of defendant's person disclosed . . . no marijuana or other contraband." (*Id.* at p. 792; see *United States v. Quintana* (M.D.Fla. 2009) 594 F.Supp.2d 1291, 1295 [duffel bag "smelled strongly of raw marijuana" but police "found no marijuana inside the bag"]; *State v. Davis* (La.Ct.App. 1991) 580 So.2d 1046, 1048 [police "detected a strong odor of raw marijuana during the vehicle search" but "found no marijuana"].) As these examples show, it is not difficult to conjure scenarios in which the smell of marijuana emanating from an otherwise nondescript package does not reveal its contents with a level of clarity akin to plain view.

It may be possible for a marijuana odor emanating from a closed container to be so distinctive and intense that no one could have a reasonable expectation of privacy in the container's contents. As today's opinion notes, the record in this case does not permit us to resolve that issue one way or the other. (See maj. opn., *ante*, at p. 31.) The discussion above suggests there are substantial hurdles that

15

such a plain smell doctrine would have to overcome to justify departing from the clear, administrable rule that opening a closed container requires a search warrant.

My observations cast no doubt on the settled proposition that the smell of marijuana can establish probable cause to search and, in the context of an automobile search or exigent circumstances, can provide a sufficient basis to proceed without a warrant. (See, e.g., *Cook*, *supra*, 13 Cal.3d at pp. 668–670; *Gale*, *supra*, 9 Cal.3d at p. 794; *Mann v. Superior Court* (1970) 3 Cal.3d 1, 7.) But it is an altogether different proposition to contend that the smell of marijuana can be sufficient by itself to negate any reasonable expectation of privacy in a closed container. Although the high court has suggested that there might be no legitimate expectation of privacy in a container whose "outward appearance" (*Sanders*, *supra*, 442 U.S. at p. 765, fn. 13) or "distinctive configuration" (*Robbins*, *supra*, 453 U.S. at p. 428 (plur. opn.)) clearly announces its contents, neither the high court nor this court has upheld a warrantless search solely on the basis of *Sanders*'s posited expansion of the plain view doctrine. Lower courts have not agreed on the scope or proper application of the *Sanders* dictum, and the breadth of circumstances potentially implicating it is cause for caution. Moreover, it is questionable whether the smell of marijuana alone can reveal the contents of a closed container so clearly as to eliminate any legitimate privacy interest.

In sum, there is ample reason for courts, including ours, to hesitate before accepting a novel legal theory that would allow the search of a closed container to proceed without a warrant based solely on the smell of contraband.


LIU, J.

I CONCUR:  WERDEGAR, J.


16

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Robey v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 200 Cal.App.4th 1
**Rehearing Granted**

_____

**Opinion No.** S197735
**Date Filed:** June 27, 2013

_____

**Court:** Superior
**County:** Santa Barbara
**Judge:** Edward H. Bullard

_____

**Counsel:**

Raimundo Montes De Oca, Public Defender, and Patricia Dark, Deputy Public Defender, for Petitioner.

Stephen P. Lipson, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defenders Association and Public Defenders of Ventura County as Amici Curiae on behalf of Petitioner.

No appearance of Respondent.

Joyce E. Dudley, District Attorney, and Michael J. Carrozzo, Deputy District Attorney, for Real Party in Interest.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II and Thomas C. Hsieh, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patricia Dark
Deputy Public Defender
County Courthouse, 3rd Floor
Santa Barbara, CA  93101
(805) 568-3494

Michael J. Carrozzo
Deputy District Attorney
1112 Santa Barbara Street
Santa Barbara, CA  93101
(805) 568-2399